IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) | Case No. 05-00025-01-CR-W-DW |
| WALTER L. MORRIS, | ) ) ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on the following two motions:

1. Motion to Suppress Physical Evidence (doc #22); and

2. Motion to Suppress Statements (doc #23).

For the reasons set forth below, it is recommended that these motions be denied.

I. INTRODUCTION

On January 24, 2005, the Grand Jury returned a one count indictment against defendant Walter L. Morris. The indictment charges that on January 21, 2005, defendant Morris, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, a Zastava, 7.62 x 39mm rifle, which had been transported in interstate commerce.

On April 14, 2005, an evidentiary hearing was held on defendant's motions to suppress. Defendant Morris was represented by retained counsel, Martin Warhurst. The Government was represented by Assistant United States Attorney Christina Tabor. The Government called Officer Deryck Galloway and Officer William Nauyok of the Kansas City, Missouri Police Department as witnesses. The defense called Kelly Adams and Michelle Adams to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1.  On January 21, 2005, at approximately 6:16 a.m., Police Officers Deryck Galloway and William Nauyok were dispatched to 2240 Poplar on a disturbance call. (Tr. at 4-5) When the officers responded to 2240 Poplar, there was a young girl in front of the house who appeared upset. (Tr. at 5) The girl was fifteen years old. (Tr. at 31) Officer Galloway asked the girl if she had called and she responded that she had. (Tr. at 5) The girl told the officers that she was upset because her mother and her mother's boyfriend had gotten into a fight and the boyfriend had ripped the phone out of the wall. (Tr. at 5-6) The officers decided to contact the girl's mother or the boyfriend. (Tr. at 6) The boyfriend, Walter Morris, came out of the house and invited the officers into the house. (Tr. at 6-7) The officers were standing in the main entryway of the house. (Tr. at 7-8) The officers observed that the phone jack was ripped out of the wall. (Tr. at 8) Officer Galloway asked defendant Morris whether there had been a disturbance between the girl's mother and him. (Tr. at 6) Morris advised that they had an argument, he got upset and ripped the phone out of the wall, but that he had not assaulted the girl's mother. (Tr. at 6-7) The girl said that she did not see any assault. (Tr. at 7) Based on this information, Officer Galloway testified that they could not prove that there had been an assault. (Tr. at 7) The officers asked Morris and the girl if they could stay separated so that there would not be any further arguments. (Tr. at 7) The girl agreed to stay in her room until school. (Tr. at 7) Morris stated that he would stay downstairs and would not contact the girl. (Tr. at 7) The officers left the residence. (Tr. at 7)

2.  At approximately 6:46 a.m., the officers were dispatched back to 2240 Poplar. (Tr. at 8) The officers knocked on the door and were let in by the fifteen-year-old girl's older sister, Michelle Adams.[1] (Tr. at 9) Officer Galloway believed that Michelle was nineteen or twenty years old. (Tr. at 9) The officers determined that Michelle and her younger sister were the only persons present in the residence.[2] (Tr. at 32-33) Officer Galloway had the impression that Michelle had care, custody and control of her younger sister just like any babysitter would. (Tr. at 38-39) The officers talked to Michelle and the fifteen-year-old girl in the main living area of the house. (Tr. at 9, 13) Michelle had led the officers into the living room area. (Tr. at 14) The fifteen-year-old girl told the officers that after the officers left the residence, she and her ten-year-old brother went to her room and locked the door. (Tr. at 9-10) Defendant Morris came upstairs screaming and wanting in the bedroom. (Tr. at 10) The girl refused to open the door. (Tr. at 10) Morris rolled a bullet under the door and screamed that if she called the cops again, he would kill her. (Tr. at 10) The girl bent down and picked up the bullet. (Tr. at 10) Morris screamed at her to open the door and give the bullet back to him. (Tr. at 10-11) The girl again refused to open the door. (Tr. at 11) Morris then forced the door open and tried to grab the bullet from the girl. (Tr. at 10-11) Morris punched the girl in the eye and took the bullet. (Tr. at 11) The officers observed that the girl had redness around her face and eye. (Tr. at 11)

3.  Immediately to the right of the living room area where the officers were talking to the fifteen-year-old girl and her sister was another open area that led into the dining room which had been converted into a bedroom. (Tr. at 13) There was no door to

---

[1] Michelle Adams testified that her sister let the officers in. (Tr. at 76)

[2] The girls' mother, Kelly Adams, her ten-year-old son and defendant Morris left the residence when the fifteen-year-old girl was on the phone calling the police. (Tr. at 73)

2

the dining room/bedroom or curtain over the entryway. (Tr. at 37-38) While the fifteen-year-old girl was talking, she pointed to the dining room/bedroom and said, there's the box of bullets there. (Tr. at 13) Officer Galloway looked and saw a bullet box sitting on a bed with markings of a 7.62. (Tr. at 14, 37) The girls told the officers that defendant Morris and their mother slept in the dining room/bedroom. (Tr. at 26-27, 30) Officer Galloway walked into the dining room/bedroom and opened the box to verify that it contained bullets. (Tr. at 14) Officer Galloway also observed one bullet lying on the floor of the dining room/bedroom after he walked into the room. (Tr. at 14, 37) The girls followed Officer Galloway into the dining room/bedroom. (Tr. at 38)

4. The officers asked to see the bedroom where the assault took place. (Tr. at 15) Someone said "sure" and both girls led the officers upstairs.[3] (Tr. at 15) The officers wanted to see the bedroom so that they could determine whether there was damage to the doorjamb or the door in order to corroborate the girl's story. (Tr. at 15) Officer Galloway observed fresh damage to the doorjamb. (Tr. at 15)

5. Michelle Adams told the officers that she was not at home when the incidents with her sister occurred, but Michelle stated that before the officers were there the first time that day, she had witnessed defendant Morris having an argument with her boyfriend. (Tr. at 12) Michelle told the officers that she grabbed her boyfriend and said we need to get out of here and that her mother gave Michelle and her boyfriend a ride out of there.[4] (Tr. at 12) Officer Galloway testified that according to Michelle, Morris followed them out the door and stood in the doorway with a large brown gun screaming threats at her boyfriend. (Tr. at 12, 40) Michelle signed a statement on January 21, 2005, at 9:28 a.m., which stated that Morris was holding a gun and mumbling something as she was walking out the door with her boyfriend.[5] (Government's Ex. 2)

6. Officer Galloway testified that he asked the girls more about the bullets and gun. (Tr. at 16) The younger sister told the officers that the gun was kept in her younger brother's bedroom. (Tr. at 16) The younger sister then asked if the officers wanted to see, they said sure, and she led them to her brother's bedroom. (Tr. at 16) The older sister was right there with them. (Tr. at 16)

7. The door to the younger brother's bedroom was wide open. (Tr. at 17) Officer Galloway got the impression that anybody is allowed to enter the room. (Tr. at 39) Officer Galloway described the room as being fairly small. (Tr. at 17) It had a bunk bed, a TV and a video game system in it. (Tr. at 17) There was some kid's clothing in the room. (Tr. at 18) There were also alcohol bottles and ashtrays next to the TV. (Tr. at 17) The fifteen-year-old girl entered the room first, followed by her older

---

[3]Michelle Adams testified that she did not give the police permission to search anywhere. (Tr. at 77) Michelle admitted that she never asked the officers to leave the residence. (Tr. at 94)

[4]Kelly Adams denied that her daughter's boyfriend and Morris had gotten into a dispute. (Tr. at 72-74)

[5]Michelle Adams testified that the statement she made to the police about Morris threatening her boyfriend with a rifle was not the truth. (Tr. at 78) She said she was just going along with what her sister said. (Tr. at 79)

3

sister and then the officers. (Tr. at 17, 53) The younger girl started to walk towards the closet and said the gun was kept in the closet. (Tr. at 17) The closet door was wide open and Officer Galloway testified that he could see an assault rifle standing on its butt stock at an angle in the closet. (Tr. at 18) Officer Galloway stopped the girl for safety reasons. (Tr. at 17) The gun was not visible from outside the bedroom. (Tr. at 31)

8. Officer Galloway asked Michelle Adams if that was the gun that she saw and she verified that it was the gun. (Tr. at 18) The girls then volunteered that Walter Morris had been in prison. (Tr. at 18) Officer Galloway stated that he thought the girls said Morris had been in prison for burglary. (Tr. at 18)

9. While the officers were in the bedroom, they asked the girls whose room they were in. (Tr. at 25-26) Officer Galloway testified that one of the girls advised the officers that their younger brother slept in the room.[6] (Tr. at 26) The girl further advised that because the TV and game system were in the room, the room was used by everybody, especially defendant Morris.[7] (Tr. at 26) Officer Galloway testified that he did not get the impression that Michelle Adams and her younger sister were not allowed to be in the room. (Tr. at 26) Officer Nauyok also testified that he got the impression that the girls had permission to enter the room because the younger sister told him that the family hangs out in the room to play the game system. (Tr. at 54-55)

10. Officer Galloway called various detectives trying to determine which department would be handling the follow-up investigation. (Tr. at 19) Officer Galloway also wanted to verify that defendant Morris was a convicted felon to determine whether it was illegal for the firearm to be in the house. (Tr. at 19) While Officer Galloway was on the phone, Kelly Adams, Morris and the younger brother returned home. (Tr. at 20) Officer Nauyok noticed their return when he heard Kelly Adams yelling. (Tr. at 48) The officers and the girls immediately went downstairs. (Tr. at 48) Officer Galloway had verified that Morris had a felony prior to Morris' return to the residence. (Tr. at 34) Officer Galloway had not removed the gun from the closet prior to Morris' return. (Tr. at 34)

11. As the officers and the girls went downstairs, Kelly Adams was yelling at her fifteen-year-old daughter and telling her she was wrong for calling the police. (Tr. at 48) Kelly Adams said that defendant Morris would go to jail because of the girl and that they would probably have to move because she would not be able to make it there without Morris. (Tr. at 48) Kelly Adams testified that she now lives at 2023 Poplar. (Tr. at 60) Kelly Adams testified that she was angry at her daughter for calling the police. (Tr. at 63)

12. Officer Galloway talked to the younger brother about the assault and the rifle. (Tr. at 20-21) The boy told Officer Galloway that he had been in his sister's room with the door locked when Walter Morris was hollering at her to not call the police. (Tr.

---

[6]Michelle Adams testified that her seventeen-year-old and nineteen-year-old brothers slept in the room. (Tr. at 77)

[7]Michelle Adams testified that none of the children have permission to go into each other's bedrooms. (Tr. at 78)

4

at 21) Morris rolled something under the door, but the boy was not sure what it was because his sister grabbed it up too fast. (Tr. at 21) Morris then forced open the door. (Tr. at 21) When Officer Galloway asked the boy about the tussle for the item and Morris assaulting the girl, the boy did not want to answer Galloway's question and began looking away. (Tr. at 21) Officer Galloway got the impression that the boy really liked Morris. (Tr. at 21) The boy told Officer Galloway that he had seen Walter Morris hold the gun in the past. (Tr. at 21)

13. Officer Galloway asked defendant Morris what happened after they (the police) left that morning and how damage was done to the door because the girl was making some allegations. (Tr. at 21, 42) Officer Galloway testified that Morris was not under arrest or in custody at that time, but he was also not free to leave because the officers were conducting their investigation. (Tr. at 21-22, 35) Morris denied everything. (Tr. at 21) Officer Galloway then told Morris that the older sister claimed that when she and her boyfriend were leaving with the mother, Morris was holding a gun in the doorway. (Tr. at 22) Morris stated that he was not holding the gun at that time, but that he had held it earlier in the night. (Tr. at 22) At no time did Officer Galloway give Morris a Miranda warning. (Tr. at 36)

14. Officer Galloway made another phone call to the detectives. (Tr. at 22) Officer Galloway was not getting a decision from the detectives about what they wanted to do about Morris because different departments handle child abuse and felon in possession cases. (Tr. at 22-23) Eventually, everyone agreed that at the least, Morris needed to be arrested for the child abuse. (Tr. at 22) Morris was told he was under arrest. (Tr. at 42) Morris was still not given any Miranda warning because the officers did not intend to ask him any more questions. (Tr. at 43)

15. Thereafter, it was determined that the Robbery Unit would handle the felon in possession charge and Officer Galloway was told to recover the gun and the bullets and to arrest Mr. Morris for being a felon in possession, along with the child abuse. (Tr. at 23) Officer Galloway recovered the gun from the closet. (Tr. at 24) The gun was not loaded, but there were two bullets on the closet floor. (Tr. at 24) These bullets were in plain view to the officers as they were standing in the bedroom. (Tr. at 24) These two bullets, as well as the bullets in the dining room/bedroom, were recovered by Officer Galloway. (Tr. at 24) Officer Galloway testified that the bullets were recovered because they were in relation to the gun and because Kelly Adams stated that she did not want them. (Tr. at 24-25) In addition, one of the bullets, that is the bullet defendant Morris rolled under the door, had been used in the assault. (Tr. at 25) The gun was significant to the investigation of both the felon in possession charge and possibly an assault charge with respect to Morris threatening Michelle Adams' boyfriend. (Tr. at 25)

16. As Officer Galloway was taking the gun out of the house, the officers explained to Kelly Adams that the gun was not a self-defense gun, that it was an assault rifle, and asked why she had such a large gun in her house. (Tr. at 23, 49) Kelly Adams explained that several months earlier her older son had a problem with other boys who were threatening him, so she had purchased the gun for self-defense purposes and because it was cheap and scary. (Tr. at 23-24) While the officers were talking to Kelly Adams, defendant Morris stated that he had the gun to protect his family and if the juveniles came up into his yard, he was going to shoot and kill them. (Tr. at 49) Defendant Morris' statement was not in response to any questions asked of him by the officers. (Tr. at 56) Kelly Adams stated that they were no longer having

5

those problems so she did not need the gun anymore and the officers could take it. (Tr. at 24) The officers were going to take the gun no matter what Kelly Adams said. (Tr. at 33)

17. As Officer Galloway was leaving the residence with the gun, defendant Morris stated, "I did not know I could be arrested for possession when it's not on my person." (Tr. at 43, 47) Officer Nauyok explained to Morris that having a firearm in a house with him or in a car is considered possession. (Tr. at 47) Morris then made another statement, "So, I could have been arrested in the car when we were bringing it home after buying it?" (Tr. at 47)

18. Kelly Adams testified that she has had a relationship with defendant Morris for approximately four years. (Tr. at 60) Morris lived with Kelly Adams at 2240 Poplar. (Tr. at 63) Kelly Adams testified that Morris had hit her in the past. (Tr. at 75) Kelly Adams testified that her fifteen-year-old daughter did not have authority to let people in and out of the house. (Tr. at 61) Kelly Adams testified that her daughter did not have authority to let people in and out of Kelly Adams' bedroom nor did her daughter have authority to go into Kelly Adams' bedroom herself. (Tr. at 62) Further, according to Kelly Adams, the children living in the house did not have permission to go into each other's bedrooms. (Tr. at 62) Finally, Kelly Adams testified that her boys' bedroom was not used as a common area accessible to all. (Tr. at 62)

19. Kelly Adams testified that defendant Morris was with her when she purchased the weapon. (Tr. at 64-65) Kelly Adams moved to 2240 Poplar in October of 2004. (Tr. at 67) Kelly Adams testified that Morris may have put the weapon in Adams' son's room when they moved into the house. (Tr. at 67-68)

20. Kelly Adams testified that there were no bullets in her bedroom when she left on January 21, 2005, at approximately 5:30 a.m. (Tr. at 69-70) When Kelly Adams left the residence at 5:30 a.m., her fifteen-year-old daughter, ten-year-old son and defendant Morris were in the residence. (Tr. at 70-71)

21. Defendant Morris signed a Miranda Waiver at 11:35 a.m. on January 21, 2005. (Government's Ex. 4) Morris then made a statement at 12:14 p.m. (Government's Ex. 5)

### III. DISCUSSION

A.  Motion to Suppress Physical Evidence

Defendant seeks to suppress "any and all evidence, or testimony regarding any evidence allegedly seized on or about January 21, 2005 at 2240 Poplar ... including but not limited to, a Zastava Assault Rifle and ammunition" on the basis that such evidence was obtained in violation of defendant's rights under the Fourth Amendment. (Motion to Suppress Physical Evidence at 1) Defendant argues that "15 year old Brittany Adams did not have the common authority over the premises required to give consent. Certainly she did not have authority to consent to the search of

6

bedrooms other than her own." (Id. at 2)

The Government presents a "threshold question" as to whether defendant Morris has standing to challenge the admission of the assault rifle and ammunition into evidence because he claims no possessory or ownership interest in these items and, therefore, holds no Fourth Amendment privacy interest in them. (Government's Response at 10) The Government argues that "Morris has the burden of establishing that he has a legitimate expectation of privacy in the area searched and the items seized. Smith v. Maryland, 442 U.S. 735, 740 (1979)." (Government's Response at 10) (emphasis supplied) Contrary to the Government's argument, the Court does not read the Smith case as requiring an expectation of privacy in both the area searched and the items seized. Rather, the Smith case has been cited for requiring an expectation of privacy in the area searched or the items seized. See United States v. Reyes, 908 F.2d 281, 285 (8th Cir. 1990), cert. denied, 499 U.S. 908 (1991)("In order to successfully challenge the constitutionality of the search, Reyes must show that he possessed a reasonable expectation of privacy in the area searched or the items seized. California v. Greenwood, 486 U.S. 35, 39 (1988); Rakas v. Illinois, 439 U.S. 128, 148-49 (1978); Smith v. Maryland, 442 U.S. 735 (1979); Katz v. United States, 389 U.S. 347, 361 (1967).") See also United States v. Delgado, 121 F.Supp.2d 631, 637 (E.D. Mich. 2000)("to require a defendant, who has a legitimate expectation of privacy in the place searched, to also affirmatively claim ownership in the seized items presents ... too narrow a view of the Fourth Amendment"). The facts clearly show that defendant Morris was living in the residence at 2240 Poplar. (See Fact Nos. 3, 9 and 18) Defendant Morris has standing to challenge the search and seizure.

The Fourth Amendment protects the home from warrantless searches and seizures. See United States v. Dunn, 480 U.S. 294, 300 (1987). However, an exception to this protection occurs where proper consent has been voluntarily given. See United States v. Matlock, 415 U.S. 164, 165-66 (1974). A further exception occurs when police officers are presented with exigent circumstances. See Payton v. New York, 445 U.S. 573, 590 (1980).

The Supreme Court has set forth the following with respect to whether a warrantless entry

7

of a residence is valid when based upon the consent of a third party:

> The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained ... from a third party who possesses common authority over the premises. ...
>
> ... "[c]ommon authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes ..."
>
> * * *
>
> ... what we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

Illinois v. Rodriguez, 497 U.S. 177, 181, 188-89 (1990)(citations omitted). See also Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994)("there is no Fourth Amendment violation if the facts available to the officer at the time of the search would warrant a reasonable man in the belief that someone with authority over the premises consented to the search"); United States v. Brokaw, 985 F.2d 951, 953 (8th Cir.), cert. denied, 510 U.S. 913 (1993)("where someone who reasonably appears to have control of the premises in question consents to the search, there is no constitutional violation").

In this case, Officers Galloway and Nauyok were dispatched twice in the early morning hours to 2240 Poplar based on calls from a fifteen-year-old resident of the house. (See Fact Nos. 1 and 2, supra) On their second visit, the officers were invited into the house and led into the living room area by Michelle Adams, an adult.[8] (See Fact No. 2, supra) Michelle's sister, the fifteen-year-

---

[8]The Court acknowledges that most of Michelle Adams' testimony is inconsistent with that of the officers. For instance, Michelle Adams testified that her sister let the officers in. (See footnote 2, supra) Michelle told the officers that defendant Morris had threatened her boyfriend earlier that morning with a gun and signed a statement at the police station to that effect. (See

8

old, advised the officers that after they left the residence that morning, defendant Morris had rolled a bullet under her locked bedroom door and screamed that if she called the cops again, he would kill her. (See Fact No. 2, supra) When the girl refused to give the bullet back to Morris, he forced the door open, punched the girl in the eye and took the bullet. (See Fact No. 2, supra) The officers observed that the girl had redness around her face and eye which added credence to her story. (See Fact No. 2, supra) Immediately to the right of the living room area where the officers were talking to the fifteen-year-old girl and her sister was another open area that led into the dining room which had been converted into a bedroom. (See Fact No. 3, supra) There was no door to the dining room/bedroom or curtain over the entryway. (See Fact No. 3, supra) While the fifteen-year-old girl was talking, she pointed to the dining room/bedroom and said, there's the box of bullets there. (See Fact No. 3, supra) Officer Galloway looked and saw a bullet box sitting on a bed with markings of a 7.62. (See Fact No. 3, supra) The girls accompanied Officer Galloway into the dining room/bedroom where Officer Galloway verified that the box contained bullets. (See Fact No. 3, supra)

      The plain view doctrine allows police officers to seize items of evidence without a warrant when: (1) the officers did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the item's incriminating character is immediately apparent; and (3) the officers have a lawful right of access to the item itself. See United States v. Murphy, 69 F.3d 237, 241 (8th Cir. 1995), cert. denied, 516 U.S. 1153 (1996). See also Payton v. New York, 445 U.S. 573, 587 (1980)("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.") In this case, Officers Galloway and Nauyok were justifiably present in the living room area when the fifteen-year-old girl pointed to the box of bullets which were in plain view

---

Fact No. 5 and footnote 5, supra) While Michelle testified at the hearing that she lied to the police in this statement, the Court finds it more probable that Michelle lied at the hearing before this Court. Michelle is likely regretting her part in these charges which have been brought against her mother's boyfriend.

9

Case 4:05-cr-00025-DW   Document 30   Filed 05/06/05   Page 9 of 15

through the open entryway of the dining room/bedroom. Given that a bullet was involved in the alleged assault, the incriminating character of the box of bullets waw immediately apparent. Finally, Michelle Adams and her sister accompanied Officer Galloway into the dining room/bedroom where Officer Galloway verified that the box contained bullets. The Court finds that Michelle Adams and her sister had common authority over the premises sufficient to allow the police to look about the family residence. As set forth in United States v. Clutter, 914 F.2d 775 (6th Cir. 1990), cert. denied, 499 U.S. 947 (1991):

> As a general consideration, there is every reason to suppose that mature family members possess the authority to admit police to look about the family residence, since in common experience family members have the run of the house. So, in that sense, absent special circumstances, all rooms in the residence can be said to be areas of usage common to all members of the family. It is, of course, conceivable that family members will exclude from this common authority access to areas where they wish to maintain an expectation of privacy, even from other members of the family. Accordingly, courts are understandably reluctant to approve third-party consent searches of an enclosed space in which the family member targeted for the search has clearly manifested an expectation of exclusivity.

Id. at 777-78. While Michelle Adams testified that she did not give the police permission to search anywhere, she also admitted that she never asked the officers to leave the residence. (See footnote 3, supra) By inviting the officers into the residence, leading them into the living room area and then accompanying them into the dining room/bedroom without objection, it was reasonable for the officers to assume that Michelle consented to their entry into the room.[9] There was no indication that defendant Morris or Kelly Adams intended to exclude other members of the family from the dining room/bedroom.[10] In fact, there was not even a door or curtain over the entryway. Further, defendant Morris and Kelly Adams purposely left the residence in the exclusive control of Michelle

---

[9]"[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct. Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: "You have my permission to search." United States v. Buettner-Janusch, 646 F.2d 759, 764 (2nd Cir.), cert. denied, 454 U.S. 830 (1981).

[10]The Court acknowledges that Kelly Adams testified that her fifteen-year-old daughter did not have authority to let people in and out of Kelly Adams' bedroom nor did her daughter have authority to go into Kelly Adams' bedroom herself. (See Fact No. 18, supra) As with the testimony of Michelle Adams, the Court does not find the testimony of Kelly Adams to be credible.

10

Adams and her younger sister when they found out the police had been summoned to the residence. (See footnote 2, supra)  The officers' limited search of the dining room/bedroom did not violate the Fourth Amendment.

In continuing with their investigation of the alleged assault, the officers asked to see the bedroom where the assault took place.  (See Fact No. 4, supra)  The girls led the officers upstairs.  Officer Galloway observed fresh damage to the doorjamb, further corroborating the girl's story.  (See Fact No. 4, supra)  Michelle Adams then told the officers that earlier that day, Morris had threatened her boyfriend with a gun.  (See Fact No. 5, supra)  The younger sister told the officers that the gun was kept in her younger brother's bedroom.  (See Fact No. 6, supra)  The younger sister then asked if the officers wanted to see, they said sure, and she led them to her brother's bedroom.  (See Fact No. 6, supra)  The older sister was right there with them.  (See Fact No. 6, supra)  The door to the younger brother's bedroom was wide open.  (See Fact No. 7, supra)  Officer Galloway and Officer Nauyok each testified that they got the impression that anybody is allowed to enter the room.  (See Fact Nos. 7 and 9, supra)  The fifteen-year-old girl advised that because a TV and game system were in the room, the room was used by everybody in the family.  (See Fact No. 9, supra)  The fifteen-year-old girl entered the room first, followed by her older sister and then the officers.  (See Fact No. 7, supra)  The younger girl started to walk towards the closet and said the gun was kept in the closet.  (See Fact No. 7, supra)  The closet door was wide open and Officer Galloway testified that he could see an assault rifle standing on its butt stock at an angle in the closet.  (See Fact No. 7, supra)  Michelle Adams verified that it was the gun she had seen Morris threatening her boyfriend with earlier that day.  (See Fact No. 8, supra)  The girls then volunteered that Walter Morris had been in prison.  (See Fact No. 8, supra)

Again, the Court finds that Michelle Adams and her sister had common authority over the premises sufficient to allow the police to look about the family residence.  The Court further finds that it was objectively reasonable for the officers to believe that Michelle Adams and her younger

11

sister had authority to consent to the search of their little brother's bedroom.[11] The door to the room was wide open. While the officers were justifiably present in the bedroom, the officers saw the assault rifle in plain view through the open door to the closet. Given that the rifle was involved in an alleged assault of Michelle Adams' boyfriend and the girls' information that Morris had spent time in prison, the officers had probable cause to associate the rifle with criminal activity. The officers' limited search of the bedroom did not violate the Fourth Amendment.

In the alternative, the Court finds that the officers were presented with exigent circumstances which provided an exception to the Fourth Amendment protection from warrantless searches and seizures. Exigent circumstances exist "[w]here, in circumstances beyond the officers' control, lives are threatened, a suspect's escape is probable, or evidence is about to be destroyed." United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 511 U.S. 1077 (1994).

In this case, Officers Galloway and Nauyok were twice dispatched to a residence to investigate a disturbance and an assault. (See Fact Nos. 1 and 2, supra) While at the residence the second time, the officers were advised that defendant Morris had threatened the fifteen-year-old girl with a bullet stating that he would kill her if she called the police again. (See Fact No. 2, supra) The officers were further advised that Morris had threatened Michelle Adams' boyfriend with a gun earlier in the morning. (See Fact No. 5, supra) The Court has been advised in other cases it has heard that when officers are called to a home because of a domestic violence situation and there is a gun in the home, the officers will generally take the gun because they do not want a gun where there is a potential for further violence. The Court finds that the officers had a legitimate concern for the safety of the residents of and visitors to the residence which constituted exigent circumstances justifying the warrantless search. The scope of the officers' warrantless search did not exceed what was necessitated by the exigency. Based on the exigent circumstances present in

---

[11]The Court acknowledges that Kelly and Michelle Adams testified that the children living in the house did not have permission to go into each other's bedrooms. Kelly Adams also testified that her boys' bedroom was not used as a common area accessible to all. (See footnote 7 and Fact No. 18, supra) As set forth above, the Court does not find the testimony of Kelly or Michelle Adams to be credible.

12

this case, the officers were not required to obtain a search warrant before retrieving the rifle and bullets.

There was no violation of defendant's constitutional right to be free from unreasonable searches and seizures. Defendant's Motion to Suppress Physical Evidence must be denied.

### B.   Motion to Suppress Statements

Defendant seeks to suppress "any and all evidence, or testimony regarding any statements allegedly made by the accused on or about January 21, 2005 ... including but not limited to statements regarding a weapon and ammunition recovered from 2240 Poplar" on the basis that such statements were obtained in violation of defendant's rights under the Fourth and Fifth Amendments. (Motion to Suppress Statements at 1) Defendant argues that any statements made prior to 11:35 a.m. on January 21 were in violation of his right to remain silent as he was not given Miranda warnings. (Id.) Defendant further argues that all statements made by defendant were fruit of the poisonous tree in that all statements flowed from the illegal search of 2240 Poplar. (Id.)

#### 1.   Defendant's Statements Made Prior to Arrest

As set forth above, during his investigation of the alleged assault, Officer Galloway asked defendant Morris what happened after they (the police) left that morning and how damage was done to the door because the girl was making some allegations. (See Fact No. 13, supra) Officer Galloway testified that Morris was not under arrest or in custody at that time. (See Fact No. 13, supra) Morris denied everything. (See Fact No. 13, supra) Officer Galloway then told Morris that the older sister claimed that when she and her boyfriend were leaving with the mother, Morris was holding a gun in the doorway. (See Fact No. 13, supra) Morris stated that he was not holding the gun at that time, but that he had held it earlier in the night. (See Fact No. 13, supra)

"The basic rule of Miranda is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). No Miranda warnings were required prior to defendant's pre-arrest statement since defendant was

not being interrogated while in custody when the statement was made. See United States v. Cordova, 990 F.2d 1035, 1037 (8th Cir.), cert. denied, 510 U.S. 870 (1993)("reading of Miranda rights is required whenever a suspect is (1) interrogated (2) while in custody"). Stated another way, "a Miranda warning is not a prerequisite to a noncustodial interrogation or to a custodial discussion that does not amount to interrogation." United States v. Thomas, 1995 WL 106411, 5 (D. Kan. Feb. 13, 1995).

Officer Galloway was speaking to defendant to get his side of the story with respect to an investigation into a complaint made by the fifteen-year-old girl and a complaint made by Michelle Adams. Earlier that morning, Officer Galloway had similarly spoken to defendant with respect to an investigation into another complaint made by the fifteen-year-old. A decision had not yet been made by the detectives as to whether defendant should be arrested. (See Fact No. 14, supra) Since defendant Morris was not being questioned while in custody, Officer Galloway was under no obligation to read him the Miranda warnings.

### 2. Defendant's Statements Made at the Residence After His Arrest

As set forth above, while the officers were talking to Kelly Adams, defendant Morris stated that he had the gun to protect his family and if the juveniles came up into his yard, he was going to shoot and kill them. (See Fact No. 16, supra) As Officer Galloway was leaving the residence with the gun, defendant Morris volunteered, "I did not know I could be arrested for possession when it's not on my person." (See Fact No. 17, supra) Officer Nauyok explained to Morris that having a firearm in a house with him or in a car is considered possession. (See Fact No. 17, supra) Morris then made another statement, "So, I could have been arrested in the car when we were bringing it home after buying it?" (See Fact No. 17, supra)

"Miranda has no application to statements ... that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." United States v. Cordova, 990 F.2d 1035, 1038 (8th Cir.), cert. denied, 510 U.S. 870 (1993)(quoting United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990)). Defendant

14

Morris' statements were not in response to any questions asked of him by the officers.

        3.        Defendant's Statements Made at the Police Station

Defendant Morris signed a Miranda Waiver at 11:35 a.m. on January 21, 2005, and then made a statement at 12:14 p.m. (See Fact No. 21, supra) There was no evidence presented that defendant Morris was coerced, intimidated or incapacitated in any way when he was given his Miranda rights and made a statement.

Given the Court's finding that there was no constitutional violation in the search of 2240 Poplar, defendant's argument that all statements obtained from him must be suppressed as fruits of the poisonous tree must be denied.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Morris' Motion to Suppress Physical Evidence (doc #22). It is further

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Morris' Motion to Suppress Statements (doc #23).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                        */s/ Sarah W. Hays*
                                                        SARAH W. HAYS
                                      UNITED STATES MAGISTRATE JUDGE